[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 306-NN
The plaintiffs, Michael E. Nazarko, Thomas Nazarko, Donald Fortunato and Martina Fortunato, appeal the decision of the defendant East Lyme Zoning Commission (zoning commission), approving, with conditions, the application of the defendant Niantic Sportsmen's Club, Inc. (club) for a special permit to operate a skeet range, together with auxiliary parking for members and guests using the range for recreational target shooting, and for an exception to §§ 24.2(A) and 24.2(B) of the Zoning Regulations of the Town of East Lyme (zoning regulations), concerning the width and surface of the access driveway, on property owned by the club located at 67 Plants Dam Road in East Lyme. The zoning commission acted pursuant to §8-3c (b) of the General Statutes and § 25 of the zoning regulations. The plaintiffs appeal pursuant to § 8-8 of the General Statutes.
PROCEDURAL HISTORY
Notice of the zoning commission's decision was published inThe Day, a local newspaper, on August 24, 1994. (Return of Record [ROR], Item 44.) The plaintiffs served the zoning commission on September 2, 1994, by leaving copies of the appeal papers with CT Page 306-OO Esther B. Williams, East Lyme town clerk, at town hall; and with, or at the usual place of abode of, Wayne L. Fraser, chairman of the zoning commission. (Sheriff's Return.) The plaintiffs served the club by leaving copies of the appeal papers with, or at the usual place of abode of, John D. MacDougall, the club's president, on September 2, 1994. (Sheriff's Return.) The appeal was filed with the clerk of the superior court for the judicial district of New London at Norwich on September 9, 1994.
The zoning commission filed the return of record on November 17, 1994. The plaintiffs filed a brief on March 27, 1995. The zoning commission filed an answer on January 10, 1995, and a brief on May 27, 1995. The club filed an answer on March 31, 1995, and a brief on October 3, 1995.
FACTS
On June 6, 1994, the club submitted to the zoning commission its application for a special permit to operate a skeet range, together with ancillary parking for members and guests using the range for recreational target shooting. (ROR, Item 8.) The club requested an exception to §§ 24.2(A) and 24.2(B) of the zoning regulations, concerning the width and surface of the access driveway. (ROR, Items 2 8.) The club maintained: "The nature of the desired use of this property combined with the CT Page 306-PP extreme length of the driveway indicate that the existing width is adequate and gravel is a more appropriate surface. The existing driveway has less environmental impact and would be more consistent with the overall requirements, conditions, and goals of your regulations." (ROR, Item 2.) The club further maintained that the requirements of § 24.2(C), concerning sidewalks, and § 24.2(E)(2), concerning front landscaping, are inapplicable given that the subject premises is a back lot with a 50 foot access and there is no street frontage upon which to impose these requirements. (ROR, Item 2.)
By letter dated July 7, 1994, the conservation enforcement officer notified the chairman of the zoning commission that on June 27, 1994, the East Lyme Conservation Commission (conservation commission) had approved, with conditions, the club's application for a conservation permit. (ROR, Item 1.)[1]
On July 6, 1994, Donald Fortunato, Michael A. Stephens and Jay S. Lillquist each filed a verified "Notice of Intervention" with the zoning commission, pursuant to General Statutes §22a-19 (a). (ROR, Item 4.) On July 14, 1994, Michael E. Nazarko and Thomas Nazarko filed with the zoning commission a verified "Notice of Intervention" pursuant to General Statutes § 22a-19
(a). (ROR, Item 18.) In their verified petitions, the intervenors asserted that approval of the club's application was CT Page 306-QQ reasonably likely to have the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state. (ROR, Items 4 18.)
Notice of the public hearing on the club's application was published in The Day, a local newspaper, on June 24, 1994, and on July 1, 1994. (ROR, Item 43.) The zoning commission opened the public hearing on the club's application on July 7, 1994; the continuation of the public hearing was held on July 14 and 21, 1994. (ROR, Items 46-48.)
The hearing began with a number of letters read into the record; (ROR, Item 46, pp. 5-22.); followed by an introduction and overview of the club's application by counsel. (ROR, Item 46, pp. 22-48.)
The club owns two parcels of land in East Lyme located in the RU-40 zone. (ROR, Item 46, pp. 24, 34.) The original parcel, shown as Lot No. 9 on Assessor's Map 65, consists of approximately 92 acres and was acquired by the club in 1957. (ROR, Item 46, pp. 34-35; Item 9.) The second parcel, shown as Lot No. 10 on Assessor's Map 65, consists of approximately 71 acres. (ROR, Item 46, p. 34; Items 8 9.) The club acquired this parcel from the Manwaring family in 1991, but had always used the parcel for hunting and shooting activities. (ROR, Item 46, pp. CT Page 306-RR34-35; Items 2 8.)
The club had operated skeet fields on the 92 acre lower parcel for over thirty-five years. (ROR, Items 8 46.) When the club sought to relocate the skeet range to the adjoining 71 acre upper parcel of land, the building inspector, Ernest Bush, advised the club in writing that no building permit was required since the structures would not be inhabited. (ROR, Item 46, pp. 36-37; Item 8 Exhibit A, p. 30.) After the club constructed and began operating the two new skeet fields, which included a warm-up hut and three structures that house the skeet shooting machines, a dispute arose as to whether a permit was in fact required. (ROR, Items 8, 46-48.) The club agreed to cease operating the new skeet fields and submitted to the zoning commission an application for a special permit to operate a skeet range. (ROR, Items 2, 8, 46-48.)
Following the remarks of the club's counsel, William VonWinkle, Ph.D., an expert in acoustics, presented sound measurements taken on separate occasions at various sites within the boundaries of the club's property and at the boundary lines. (ROR, Item 46, pp. 49-74.) Noting that for "impulse" noise, the department of environmental protection suggests that decibel levels never exceed 100 during the daytime or 80 in the evening, VonWinkle testified that all sound measurements were well within CT Page 306-SS the limits set by the department of environmental protection. (ROR, Item 46, p. 53.) In response to a question posed by one commissioner, VonWinkle stated that the level of noise at the parameter properties would not be sufficient to damage one's ears. (ROR, Item 46, pp. 72-73.)
Harvey D. Luce, Ph.D., a certified professional soil scientist and recognized authority on wetlands, delineated the wetlands, examined and identified the soils within the wetlands and in the upland area of the expected shotfall, and provided an analysis as to the potential effect of lead shot on the wetlands and wetland soils. (ROR, Item 46, pp. 80-96; Item 13.) Luce concluded that because of the tendency of lead to be strongly held by soils of the type found on the club's property, the lead shot falling on the upland soils would not result in lead reaching the wetlands, leaching into the groundwater, or being carried away by surface runoff (ROR, Item 13.) Luce testified that "soils, most soils, and certainly the soils that occur on the property of the Niantic Sportsmen's Club, have a phenomenal capacity to absorb, to hold, in an irreversible manner, lead. Simply put, in most ecosystems, and it's not only the soil, it could mean other components of the ecosystem, but specially or especially the soil, lead tends to stay where you put it. It does not readily move within most ecosystems, and one of the primary reasons for that is the high tendency of the lead to be held by CT Page 306-TT the soil." (ROR, Item 46, p. 82.) Luce maintained that if lead shot were to fall into the wetlands, it would still be absorbed or retained in the wetland soils. (ROR, Item 13.) Additions of lead to the soil would be essentially "permanent and irreversible." (ROR, Item 46, p. 83.) Therefore, Luce concluded, "lead that falls in that skeet range will stay in the immediate area, will not go off the property, and will not contaminate the groundwater on the site, or the aquifer which is off site." (ROR, Item 46, p. 89.)
Charles Sever, a certified environmental assessor and groundwater hydrologist, testified "that no groundwater from the aquifer beneath the range shotfall area . . . discharges into the aquifer system from which the [c]ity gets its water supply, nor does it reach the primary recharge area for this aquifer, nor does it reach the secondary recharge area for this aquifer . . . ." (ROR, Item 46, p. 98.) Sever explained that "[t]his particular area . . . because of that wetland in there, is a discharge area and is not a recharge area to your aquifer system." (ROR, Item 46, p. 106.)
Richard C. Whiting, former Manager of the Range Department of the National Rifle Association, testified that soil and water sampling and analysis to determine lead levels indicated that lead had migrated in the soil to a depth of three inches, thus CT Page 306-UU confirming Sever's findings and Luce's observations. (ROR, Item 47, p. 29.) After thirty-five years of lead shot deposition, "[w]e weren't able to find any detrimental or adverse — material adverse effect on the environment." (ROR, Item 47, p. 36.)
Noting that lead is considered a recoverable resource; (ROR, Item 47, p. 31); and that "[i]n cleaning up ranges, we refer to it as reclamation of recyclable resource"; (ROR, Item 47, p. 32); Whiting stated that he would not recommend any reclamation program at the present time. (ROR, Item 47, p. 36.)
Whiting further commented that he had reviewed the data supplied by the acoustical engineer and that he agreed with the response mode, techniques and types of meters used. (ROR, Item 47, p. 34.) Whiting described the types of sound attenuation devices in existence at the range and suggested that other barriers could be designed, if necessary, to redirect or capture sound. (ROR, Item 47, p. 37-38.)
The club maintained that at this time, there are no suitable alternatives to lead shot. (ROR, Item 47, pp. 38-39.)
The intervenors then testified in opposition to the club's proposal. (ROR, Item 47, pp. 46-1 12.)
Intervenor Jay Lillquist, a resident of Tanglewood Drive, CT Page 306-VV asked that Fred Santoro, M.D., a pediatrician from East Lyme, speak as an expert on the health effects of lead to "describe to the Committee the concerns about lead poisoning in pediatrics." (ROR, Item 47, pp. 47-48.) Because lead had already been identified by other expert witnesses and Santoro had nothing to offer with respect to the specific site application before the commission, the chairman of the zoning commission ruled that Santoro's testimony would be out of order at this time, despite the objection of intervenor Michael Nazarko. (ROR, Item 47, pp. 48-53.)
Citing zoning regulations mandating that "[o]perations in connection with any special use shall not be more objectionable to nearby property by reason of noise, fumes, vibration or flashing lights, than would be operations of any permitted use," and that "[n]o activites shall be carried on which results in objectionable audible noise off the premises," Lillquist urged that "[o]bjectionable noise is in the ears of the beholder." (ROR, Item 47, pp. 54-55.) Lillquist questioned the club's reliance on department of environmental protection standards, noting that nowhere do the zoning regulations refer to such standards or to decibel levels. (ROR, Item 47, p. 54.)
Lillquist presented to the zoning commission a petition that had been presented to the conservation commission, signed by over CT Page 306-WW sixty residents of East Lyme opposing the club's application. (ROR, Item 47, pp. 55-57; Item 21.) The petition raised concerns about the deposition of lead shot in the wetlands; the pollution of the aquifer and East Lyme drinking water; the destruction of plant and animal life; objectionable and excessive noise; and the costs for cleanup of the hazardous waste deposit. (ROR, Item 47, p. 56.) Lillquist challenged the validity of the club's experts' findings, and urged that lead shot constitutes a hazardous waste. (ROR, Item 47, pp. 59-69.)
Intervenor Michael Nazarko challenged acoustical expert VonWinkle's report, arguing that the highest noise level the club is allowed to emit is 55 decibels during the daytime and 45 decibels at night. (ROR, Item 47, pp. 69-90.) Nazarko repeatedly questioned VonWinkle, who responded that Nazarko was improperly referring to standards for "continuous" noise, which do not apply here where you have "impulsive" noise. (ROR, Item 47, p. 76.)
Noting that no one disputes that lead is a hazardous material; (ROR, Item 47, pp. 90-91); Nazarko cited the town ordinance concerning the underground storage of hazardous substances and their disposal, and demanded that the ordinance immediately be enforced. (ROR, Item 47, pp. 92-94.)
Intervenor and abutting landowner Donald J. Fortunato, a CT Page 306-XX certified soil scientist and environmental consultant with experience in over 200 contaminated sites, argued that discharged lead shot is a hazardous waste; (ROR, Item 47, pp. 97-101); and challenged the club's experts' testimony "that there's only contamination down to three inches . . . ." (ROR, Item 47, pp. 101-02.) Fortunato discussed soil and water samples reflecting elevated levels of lead; (ROR, Item 47, pp. 105-07); and noted that "[t]he new range, the [c]lub, in some of their documents, you'll see that they're going to generate at least 150 pounds per week, almost double the amount of lead shot in the new range, as compared to the old range." (ROR, Item 47, p. 105.) In addition, Fortunato described sound readings he had recorded between August of 1993 and February of 1994, measuring in excess of the club's readings. (ROR, Item 47, pp. 102-05.)
The zoning commission next offered the club an opportunity to rebut the intervenors' comments. (ROR, Item 47, pp. 113-37.) Through its experts and attorney, the club rebutted the oppositions' claims and responded to a myriad of questions addressed to them by the zoning commission, the intervenors and members of the audience. (ROR, Item 47, pp. 113-62.)
Charles Sever disputed the intervenors' contention that discharged lead shot is a hazardous waste. (ROR, Item 47, pp. 113-15.) Sever maintained: "Now, lead, under RCRA, is not a hazardous waste — lead shot is not a hazardous waste . . . CT Page 306-YY lead shot is not considered by US EPA as hazardous waste unless it's discarded or disposed of, and that basically means generally, you abandon the site or you carry it off site, or as in the case at Remington, there is a judge that declares that the lead shot, where it is positioned, constituted an eminent and substantial endangerment to public health or the environment . . . . Now, in my best professional judgment, the location of the new site . . . is substantially less of a risk to public health and the environment, than the old site . . . . The scientific data shows that shot on the new site will not create an eminent or substantial threat to public health or the environment, and it has not been abandoned or discarded and moved off site and therefore, it is not defined as a hazardous waste under RCRA, as interpreted in the Remington Arms memo developed by EPA. Now, with reference — is there any question — it's a hazardous substance. The shot is not a hazardous waste in this case, because it does not create an eminent endangerment to public health or the environment. It is not mobile at this site. . . ." (ROR, Item 47, pp. 114-15.)
Sever further challenged the intervenors' claim that the club was in violation of the city ordinance concerning storage and disposal of hazardous substances, stating:" [T]he definition we have been discussing throughout this meeting is the definition of hazardous substance. . . . It says that it's a liquid, as CT Page 306-ZZ referred to in those regs, or as a substance that is easily dissolvable in water. Those regs were written for underground storage tanks that contain fuel or other solvents, and — but you'll find that the definition of hazardous substance, as it was used by the [i]nterven[o]rs in reference to this material, is inappropriate. That hazardous substance or material, whichever term they're using there, was defined by the authors of the book as it was to be used in interpreting these regs, and it applies to liquids and soluble — things soluble in water only, and has nothing to do with lead." (ROR, Item 47, pp. 116-17.)
Richard Whiting questioned intervenor Fortunato's sound measurements, stating: "I don't understand about the sound meter he used or the protocol he used or something, and I would very much like to study his procedures, that type [of] sound level meter he used. . . ." (ROR, Item 47 p. 117.) Whiting further stated: "I can't account for the discrepancies between his studies and the acoustical engineer. I've never seen that big a disparity." (ROR, Item 47, p. 126.) Whiting discussed sound abatement technologies that could be used to block, reflect or redirect, and thereby reduce, sound traveling to Fortunato's property. (ROR, Item 47, pp. 125-26.) Whiting clarified "nighttime versus daytime" with respect to sound measurements and decibel levels, noting: "The nighttime — the national nighttime average times are from 10 p. m. to 7 a.m. Daytime is 7 CT Page 306-AAA a.m. to 10 p. m." (ROR, Item 47, p. 119.)
In response to repeated questioning by intervenor Nazarko as to whether the club could ensure that sound levels not exceed what he purported to be the applicable standard of 55 decibels; (ROR, Item 47, pp. 137-42); acoustical expert VonWinkle stated: "It's a matter of record what was measured. We've talked about it several times. It meets, what I believe to be the applicable standard set by DEP, concerning impulse noise in regions such as where these sites are. It clearly does not meet the standards that this gentleman is talking about, which I don't think are applicable . . . . Once again, I think your question is out of context. It makes no professional sense." (ROR, Item 47, 138-39.)
On the third evening of the public hearing, Michael Stephens, Ph.D., an intervenor who had not been present on the previous evenings and member of a neighborhood group consisting of more than forty individuals who reside in the neighborhood of the club and oppose the new skeet range, expressed the group's pollution concerns. (ROR, Item 48, pp. 22-54.) Stephens testified that lead is soluble and can migrate in soil, that high levels of lead have been found in soil and water at other skeet ranges comparable in size to that proposed by the club, and that "the range is — it is already polluting the land." (ROR, Item 48, pp. 22-54.) Stephens challenged the sampling, testimony and credibility of CT Page 306-BBB the club's experts, and called for independent, "unbiased testing." (ROR, Item 48, pp. 22-54.) Upon cross-examination by the club's attorney, Stephens admitted that he was neither a hydrogeologist nor a certified soil scientist, that he had never been employed by the department of environmental protection, and that he had never tested water or soil on the site or even visited the site. (ROR, Item 48, pp. 54-55.)
Intervenor Thomas Nazarko urged that the club be required to submit a cleanup proposal for the existing range as well as for the new range. (ROR, Item 48, pp. 56-58.) Arguing that `[i]t is the responsibility of the [z]oning [c]ommission's elected members to protect the citizens of East Lyme from any possible exposure to future cleanup costs," Nazarko suggested that "[o]ne solution should be that the gun club obtain an insurance bond that would restore the site to its natural condition and cover the cost of cleanup if the [c]lub and its members abandon the skeet shooting range, or if the DEP or EPA orders a cleanup be made." (ROR, Item 48, p. 57.) Nazarko further noted that the club had not "submitted any engineer design that would make the noise level acceptable," and maintained that "the technology exists for them to alleviate the unacceptable sound levels." (ROR, Item 48, p. 58.)
The zoning commission next opened the hearing to anyone in CT Page 306-CCC the audience who wanted to speak in favor of the application. (ROR, Item 48, pp. 60-61.) Several members of the club and owners of property in East Lyme described the historical use of the club's property and urged the zoning commission to approve the club's application. (ROR, Item 48, pp. 61-69.) Several members also expressed their disappointment with the intervenors' attack on the club's witnesses and the intervenors' references to them as "so-called experts." (ROR, Item 48, pp. 64-65, 69.)
Following this testimony, the zoning commission invited comments by those in the audience opposing the application. (ROR, Item 48, pp. 69-118.) Among those testifying were the following:
Citing § 25.8 of the zoning regulations, which provides that "[n]o special permit shall be issued for property where there is an existing violation of these regulations," Nazarko argued that there are zoning violations on both the upper range, the new proposal, and the lower range, the existing range. (ROR, Item 48, pp. 71-74.) Nazarko maintained that lead shot discharged at the upper range "will travel from the upper parcel and land in the lower parcel," thereby making both parcels part of the club's application. (ROR, Item 48, p. 77.) Nazarko argued that the requested waiver for the driveway crossing both parcels is not allowed by the regulations. (ROR, Item 48, p. 88.) Citing CT Page 306-DDD sections of the zoning regulations prohibiting activity "which results in objectionable noise, audible off the premises," Nazarko noted that the zoning regulations make "no mention of DEP noise level readings." (ROR, Item 48, p. 89.) Finally, Nazarko argued that the club had improperly received a certificate of occupancy from the town for a single-family house located on the property that failed to meet the minimum code requirements. (ROR, Item 48, pp. 90-91; Item 37.)
With respect to noise, Gary Wilson, a resident of Spring Rock Road, testified: "There was also a lot of discussion on definition of `continuous' versus `impulse noise' last week. I understand the need for definitions, but submit that this continuous volley of impulse noises seconds apart, can be considered a continuous annoyance." (ROR, Item 48, p. 92.)
Stewart Craig challenged the credibility of the club's experts; (ROR, Item 48, p. 93-95); testified that "[t]he noise is clearly offensive to residents in the zoned residential neighborhood"; (ROR, Item 48, p. 94); and urged that the zoning commission "protect the community from both noise and lead pollution" and not "leave a toxic legacy for this Town." (ROR, Item 48, p. 95.)
Abutting landowner Martina Fortunato maintained: "The noise CT Page 306-EEE on my property is not objectionable, it is unbearable . . . . Basically, if this [a]pplication is approved, my property is pretty much uninhabitable." (ROR, Item 48, p. 100.) Another neighborhood resident, Mary Craig, testified: "I consider this [noise] both repetitive and obnoxious, and I can't think of many people who wouldn't, regardless of what the experts have said." (ROR, Item 48, p. 111.)
Noting that "nothing is truly insoluble"; (ROR, Item 48, p. 102); neighborhood resident Bill Lambert, Ph.D., whose training and Ph.D. "was in the field of pharmaceutics, . . . a field that is an applied field of physical chemistry," described the ion exchange process explained earlier by Sever, and cautioned: "The key thing to keep in mind though, is as you start saturating the soil, eventually you're going to run out of sites. Now there's no more sites left and it's going to keep on going down. . . . This is a dynamic process. This is not something where lead just goes in and it stays and that's the end of it. It's a dynamic process that iron flows downward through the groundwater . . . . things are going to go downward because that's where the flow is, and it's going to go downward . . . . and it's going to keep on going down towards the groundwater. . . . Again, ion exchange is reversible. Lead doesn't stay on the soil forever. It can come off when other ions come along. Once the soil is totally saturated and there's no more sites left, it's going to keep on CT Page 306-FFF going down, and it wouldn't be taken up by the soil. In cases of high water flow . . . the ion exchange doesn't take place. It's going to keep on going faster than the ion exchange can take place . . . right down into the water. . . . The key point here is flow is going to be toward the groundwater continually. . . ." (ROR, Item 48, pp. 107-08.) Arguing that "apparently the [c]onservation [c]ommission ignored the evidence that lead shot will reach the watershed, Lambert called for "environmental impact assessments . . . using an independent and unbiased firm," and suggested that a bond "be put in place by the [c]lub for future clean-up. " (ROR, Item 48, p. 110.)
Neighborhood resident Bill Kohlbrenner testified: "When they're shooting up on that ridge, it's loud, it's objectionable, and you can hear it everywhere in the neighborhood." (ROR, Item 48, p. 113.) Kohlbrenner presented to the zoning commission papers identifying annoyance caused by sounds from small firearms, which, Kohlbrenner contended, "gives you solid evidence that people find gunfire highly objectionable at the levels that we're reaching." (ROR, Item 48, p. 114; Item 38.) Kohlbrenner further noted: "The zoning regs certainly don't specify dBs. They're talking objectionable noise, and the skeet range is located on top of a range adjacent to our neighborhood, and it generates highly objectionable noises every weekend day, all year long." (ROR, Item 48, p. 114.) CT Page 306-GGG
Several other neighborhood residents reiterated the same concerns. (ROR, Item 48, pp. 116-18.)
The chairman of the zoning commission then invited the commissioners to ask questions. (ROR, Item 48, pp. 118-19.) In response to questions posed by the commissioners, experts and counsel for the club stated that the club's experts were compiling a proposed monitoring plan that would provide for routine monitoring of water and soil; (ROR, Item 48, pp. 120-22); that upon full permitting of the new skeet range, the existing range will be closed within three months; (ROR, Item 48, p. 124); that at this time, the area is not going to be reclamated; (ROR, Item 48, pp. 123-25); and that the noise levels at the boundaries of the club's property are well below the acceptable standards of the department of environmental protection. (ROR, Item 48, pp. 134-35.)
After each side made concluding remarks; (ROR, Item 48, pp. 135-69); the chairman of the zoning commission announced that the commission would begin to review the evidence at the next commission meeting in August, and the public hearing was closed. (ROR, Item 48, pp. 169-71.)
At its special meeting on August 18, 1994, the zoning CT Page 306-HHH commission discussed and unanimously approved the club's application, with the following conditions:
 1. Water Monitoring: The applicant shall conduct annual and bi-annual environmental sampling (monitoring) on the club grounds. The program is to be established to the satisfaction of the Zoning Enforcement Officer.
 2. There shall be no removal of vegetation from the area of the lead shot fall and the aquifer protection area without permission from the Zoning Officer.
. . .
 4. A noise reduction barrier shall be constructed so as to minimize the noise level on property presently owned by the Fortunatos. There should be a minimum of two sound barriers or sound buffers to be placed to minimize the impact on this property. The plan for the barriers shall be submitted by the Sportsmen's Club to the Zoning Enforcement Officer for his approval.
 5. The hours of operation shall be from 10:00 a.m. to dusk (or 8:00 p. m.) on weekdays, and on Saturday from 10:00 a.m. to 3:00 p. m., and on Sunday from 10:00 a.m. to 6:00 p. m.
6. Use of the existing skeet range is to be discontinued within CT Page 306-III three months
7. Only #9 lead shot or appropriate steel shot shall be used.
(ROR, Item 45.) The zoning commission "[g]rant[ed] waivers for landscape and sidewalk requirements and for road width surfaces for drainage requirements as per Section 24.2, a, b, c, and [of the zoning regulations]." (ROR, Item 45.)
The plaintiffs challenge the zoning commission's decision on the following grounds: 1) the zoning commission failed to provide adequate published notice of the public hearing as required by General Statutes § 8-3c; 2) the club's application failed to conform to the zoning regulations; and 3) the zoning commission refused to consider the testimony on the public health risks of lead shot deposition presented by the opponents to the application.
JURISDICTION
In order to take advantage of a statutory right to appeal from a decision of an administrative agency, there must be strict compliance with the statutory provisions which created the right.Simko v. Zoning Board of Appeals, 206 Conn. 374, 377,538 A.2d 202 (1988). The plaintiffs appeal pursuant to General Statutes CT Page 306-JJJ § 8-8 (b). Section 8-8 (b), which is the specific statutory authority permitting the appeal of a decision of a municipal zoning commission, provides in pertinent part that "any person aggrieved by any decision of a board may take an appeal to the superior court for the judicial district in which the municipality is located."
In order to have standing to bring an administrative appeal, a person must be aggrieved. New England Rehabilitation Hospitalof Hartford. Inc. v. Commission on Hospitals Health Care,226 Conn. 105, 120, 627 A.2d 1257 (1993). Pleading and proof of facts that constitute aggrievement within the meaning of the statute are prerequisites to the trial court's subject matter jurisdiction over an administrative appeal. Jolly. Inc. v. ZoningBoard of Appeals, 237 Conn. 184, 192, 676 A.2d 831 (1996).
General Statutes § 8-8 (a)(1) provides that an "`aggrieved person' includes any person owning land that abuts or is within a radius of one hundred feet of any portion of land involved in the decision of the board." Plaintiffs Donald and Martina Fortunato are the owners of property located at 61 Plants Dam Road in East Lyme. (Plaintiffs' Exhibits 1 2.) Their property abuts the club's property that is the subject of this appeal. (Plaintiffs' Exhibit 1; ROR, Items 9 11.) As abutting landowners, plaintiffs Donald and Martina Fortunato are CT Page 306-KKK statutorily aggrieved. See General Statutes § 8-8 (a)(1);Caltabiano v. Planning Zoning Commission, 211 Conn. 662, 670,560 A.2d 975 (1989).
As previously noted, plaintiffs Donald Fortunato, Michael E. Nazarko and Thomas Nazarko intervened in the administrative proceeding pursuant to General Statutes § 22a-19 (a). (ROR, Items 4 18.) Section 22a-19 provides in pertinent part: "ADMINISTRATIVE PROCEEDINGS. (a) In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law . . . any person . . . may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state." "[T]he statute `permits any person, on the filing of a verified pleading, to intervene in any administrative proceeding for the limited purpose of raising environmental issues.' ConnecticutFund for the Environment. Inc. v. Stamford, 192 Conn. 247, 248
n. 2, 470 A.2d 1214 (1984)." Red Hill Coalition, Inc. v. Town Plan Zoning Commission, 212 Conn. 727, 734, 563 A.2d 1347 (1989). An intervenor under § 22a-19 (a) becomes a party to an administrative proceeding and has "`statutory standing to appeal for the limited purpose of raising environmental issues.'" RedCT Page 306-LLLHill Coalition, Inc. v. Town Plan Zoning Commission, supra, 734, quoting Mystic Marinelife Aquarium, Inc. v. Gill,175 Conn. 483, 490, 400 A.2d 726 (1978). As intervenors under General Statutes § 22a-19 (a), plaintiffs Donald Fortunato, Michael E. Nazarko and Thomas Nazarko have standing to appeal the decision of the zoning commission.
General Statutes § 8-8 (b) provides that the appeal shall be commenced by service of process within fifteen days from the date notice of the decision was published as required by the General Statutes. Notice of the zoning commission's decision was published on August 24, 1994; (ROR, Item 44); process was served on September 2, 1994. (Sheriffs Return.) The plaintiffs' appeal is timely.
SCOPE/STANDARD OF JUDICIAL REVIEW
When ruling upon an application for a special permit, a zoning authority acts in an administrative capacity. Double ILimited Partnership v. Plan Zoning Commission, 218 Conn. 65,72, 588 A.2d 624 (1991). "In applying the law to the facts of a particular case, the board is endowed with a liberal discretion, and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal . . . ." (Citations omitted; internal quotation marks omitted.) Id. CT Page 306-MMM
DISCUSSION
"Compliance with statutorily prescribed notice requirements is a prerequisite to a valid action by a land use commission and failure to give proper notice constitutes a jurisdictional defect. Wright v. Zoning Board of Appeals, 174 Conn. 488, 491,391 A.2d 146 (1978). The primary reason for requiring notice is to advise all affected parties of their opportunity to be heard and to be appraised of the relief sought. Id. Adequate notice enables parties who have an interest in the subject property to know what is projected and to have an opportunity to protest.Jarvis Acres Inc. v. Zoning Commission, 163 Conn. 41, 47,301 A.2d 244 (1972). Constructive, rather than actual, notice is required so that as much of the populace as possible is constructively notified of the proposed action. Id. A defect in the content of the notice cannot be cured by proof that some members of the public received actual notice, or appeared at the hearing. Cocivi v. Plan Zoning Commission, 20 Conn. App. 705,708, 570 A.2d 226, cert. denied, 214 Conn. 808, 573 A.2d 319
(1990)." Peters v. Environmental Protection Board,25 Conn. App. 164, 168, 593 A.2d 975 (1991).
The plaintiffs claim that the zoning commission failed to provide adequate published notice of the public hearing on the club's application as required by General Statutes § 8-3c. CT Page 306-NNN The plaintiffs maintain that the inadequate notice constituted a jurisdictional defect rendering the zoning commission's action on the club's application a nullity.
General Statutes § 8-3c (b) provides in pertinent part that "[t]he zoning commission . . . shall hold a public hearing on an application or request for a special permit or special exception, as provided in section 8-2 . . . . Notice of the time and place of such hearing shall be published in a newspaper having substantial circulation in such municipality at least twice, at intervals of not less than two days, the first not more than fifteen days, nor less than ten days, and the last not less than two days before the date of such hearing."
"The purpose of the statutory public prehearing notice is fairly and sufficiently to apprise the public of the proposed action, so as to enable intelligent preparation for participation in the hearing. Cocivi v. Plan Zoning Commission,
[20 Conn. App. 705, 708, 570 A.2d 226, cert. denied, 214 Conn. 808,573 A.2d 319 (1990).]" R. B. Kent Son. Inc. v. Planning Commission,21 Conn. App. 370, 378, 573 A.2d 760 (1990). Although the notice need not describe the proposed action with exactitude, it may not be misleading. Id., 378; Cocivi v. Plan Zoning Commission,
supra, 708.
"Whether the content of the published notice is adequate CT Page 306-OOO represents a question of fact to be resolved by the court. Fuller, Land Use Law and Procedure (1993)." Tilcon Minerals, Inc.
v. Planning Zoning Commission, Superior Court, judicial district of New London at New London, Docket No. 530666 (May 25, 1995, Purtill, J., 14 Conn. L. Rptr. 361). The burden of proving that the published notice was defective rests on the party asserting its insufficiency. Peters v. Environmental ProtectionBoard, supra, 25 Conn. App. 170.
The zoning commission published the following notice:
 The East Lyme Zoning Commission will hold a Public Hearing on July 7th, 1994 at 6:30 P.M. at the East Lyme High School on Chesterfield Road to consider the following items:
 1. The application of the Niantic Sportmen's Club, Inc. for a Special Permit to operate a Commercial Club (Skeet and Trap Ranges) on property off Plants Dam Road, East Lyme, Connecticut, further identified as Lot 10, East Lyme Assessor's Map 65.
(ROR, Item 43.)
The plaintiffs maintain that the published notice was inadequate and misleading in that it failed to properly identify the properties owned by the applicant. In opposition to the plaintiffs' claim, the zoning commission and the club argue that CT Page 306-PPP the notice was not misleading.
In Peters v. Environmental Protection Board, supra,25 Conn. App. 166, the trial court determined that the published notice of the public hearing did not satisfy the statutory notice requirements because it failed to describe the subject property by metes and bounds, by a specific; address, or by making reference to any nearby streets or intersections. The Appellate Court affirmed the trial court, stating: "By omitting the specific location of the proposed nursing home, the board issued a defective notice. Referring to the subject property by street name only in a legal notice does not suffice to apprise as much of the populace as possible of the proposed construction. . . ." Id., 168-69. Rejecting the defendant's claims that the general public should have cross-referenced the application number with city hall records, and that earlier newspaper articles had connected the property to the applicant, the Appellate Court noted: "The statute does not call for cumulative notice, nor doesit ask that the general public employ the skills of a researchlibrarian to determine where the subject property is located. The act of giving statutory notice is much too important to be done by way of informal, unofficial or chancy cross-referencing . . . . When a published notice is lacking, something `just as good' usually will not do. See 1 M. Merrill, Notice § 493, nn. 19, 20." (Emphasis added.) Id., 169. The Appellate CT Page 306-QQQ Court concluded that the action of the board conditionally granting the permit application was null and void. Id.
Construing Peters, the Superior Court in Tilcon Minerals.Inc. v. Planning Zoning Commission, supra, stated: "The clear message of Peters is that the notice itself must be sufficient to inform the public as to where the subject property is located. The notice itself must be adequate so as to allow the members of the public to read it and determine whether his or her interest might be affected by the proposed action."
In the present case, the notice did not list the specific street address of the subject property, its size or dimensions, or its location with respect to the nearest intersecting street. (ROR, Item 43.) Such notice does not adequately describe the location of the subject property. Further, the access driveway connecting the ranges and clubhouse to Plants Dam Road crosses both the upper and lower parcels. (ROR, Items 2, 8 11.) The club sought an exception to the road width and surface requirements of the zoning regulations for this access driveway. The mere reference in the published notice to "property off Plants Dam Road, East Lyme, Connecticut, further identified as Lot # 10, East Lyme Assessor's Map 65," the 71 acre upper parcel, was inadequate and misleading.
"Without subject matter jurisdiction, the board could not CT Page 306-RRR legally [act on] the . . . permit because the board's public hearing and the decision predicated thereon are void. T. Tondro, Connecticut Land Use Regulation (1979) pp. 173-74." Koepke v.Zoning Board of Appeals, 223 Conn. 171, 177, 610 A.2d 1301
(1992). Because this issue is dispositive of the plaintiffs' appeal, this court need not consider the plaintiffs' other claims.
CONCLUSION
The plaintiffs' appeal is sustained.
Martin, J.